UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

SUSAN REESE,

                                    NO. CIV. S-08-1703 FCD GGH

          Plaintiff,

     v.                             MEMORANDUM AND ORDER

BARTON HEALTHCARE SYSTEMS,

          Defendant.
_____/

----oo0oo----

     This matter is before the court on defendant Barton
Healthcare Systems' ("defendant" or "Barton") motion for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure.  Plaintiff Susan Reese ("plaintiff" or "Reese")
opposes the motion.  For the reasons set forth below,[1]
defendant's motion for summary judgment is DENIED.

_____

     [1]     Because oral argument will not be of material
assistance, the court orders the matter submitted on the briefs.
E.D. Cal. L.R. 230(g).

## BACKGROUND[2]

Plaintiff Reese began working at defendant Barton in 1997 as a lab assistant.  (UF ¶ 1.)  She subsequently became a cardiac sonographer ("echo technician").  (UF ¶ 1.)  As an echo technician, plaintiff's job required her to press a transducer into the skin of a prone patient with one hand and operate a computer keypad connected to a machine recording the exam with the other hand (an "echo exam").  (UF ¶ 2.)

Reese claims that years of work as an echo technician and a re-injury in 2007 while performing an echo exam resulted in pain in her shoulders, wrist, head, hand, elbow, and neck, which was exacerbated in May 2007.  (UF ¶ 3; DF ¶ 3.)  This pain hampered plaintiff's ability to perform her job, which plaintiff's doctor believes aggravated her injury.  (DF ¶ 6.)  Specifically, plaintiff experiences pain when she lifts her arm out laterally and holds it, the position required when holding a scanner against a patient.  (DF ¶¶ 8-9.)  This pain also occurs when plaintiff engages in any activity that requires her to lift her arm and apply pressure, including washing her hair, carrying groceries, riding a bike, practicing yoga, kayaking, and water skiing.  (DF ¶ 10.)  The pain causes her to suffer significant sleep problems on a constant basis, resulting in mental and physical fatigue and irratability.  (DF ¶ 118.)  Plaintiff takes

---

[2]       Unless otherwise noted, the facts herein are undisputed.  (See Def.'s Reply to Pl.'s Response to Statement of Undisputed Facts in Supp. of Mot. for Summ. J. ("UF") [Docket #47-5], filed Feb. 5, 2010.)  Where the facts are disputed, the court recounts plaintiff's version of the facts.  (See Pl.'s Separate Statement of Disputed Facts ("DF") [Docket #43], filed Jan. 29, 2010.)

medications, but they have not been effective in giving her a restful night's sleep.  (DF ¶ 119.)[3]  Plaintiff's doctor considers Reese disabled.  (DF ¶ 5.)  In May 2007, plaintiff requested an accommodation for her injury from Barton.  (UF ¶ 15.)

During Reese's tenure at Barton, echo technicians were expected to be able to complete a full exam within an hour and be able to perform one exam per hour per day as needed.  (UF ¶ 8.) From January 2008 through her termination in April 3, 2008, plaintiff's injury prevented her from performing more than five echo exams per day.[4]  (UF ¶ 7.)  Plaintiff's immediate supervisor, Michael Cullen ("Cullen"), and the Vice President of Human Resources, Leanne Kankel ("Kankel"), testified that the hospital could accommodate the restriction.  (DF ¶ 16.)  However, defendant's other supervisor, Tim Gilliam ("Gilliam"), became angry with plaintiff when she refused to do a sixth exam in a day.  (Decl. of Susan Reese ("Reese Decl.), filed Jan. 29, 2010, ¶ 5.)  He began to harass plaintiff, schedule more than six exams in a day, press plaintiff to perform one more exam a day, and force plaintiff to tell staff that they needed to reschedule patients.  (Id.)  Plaintiff asserts that when she corrected the scheduling, staff would report this to Gilliam or Cullen, stating

_____

[3]    Defendant objects to plaintiff's evidence relating to her ability to sleep on the grounds that the proffered declarations contradict plaintiff's deposition testimony.  For the reasons set forth *infra* in Section A.1.a., defendant's objection is OVERRULED.

[4]    Plaintiff testified that her initial limitation was four echoes per day, which was subsequently increased to five. (UF ¶ 7.)

1  that plaintiff was demanding, inflexible, and had a bad attitude.

2  (<u>Id.</u> ¶ 9.)  Plaintiff testified that she felt she was being

3  pressured and shamed into performing more echo exams.  (DF ¶ 91.)

4  　　　In 2007, Barton received complaints about delays in getting

5  echo exams completed.  (UF ¶ 10.)[5]  In the first quarter of 2008,

6  Barton hired an additional echo technician and began scheduling

7  plaintiff to work some of her shifts on weekends.  (UF ¶ 11.)

8  Specifically, on January 25, 2008, Gilliam went into plaintiff's

9  office, unannounced, and informed her that her schedule was being

10 changed, her hours reduced, and she would have to work weekends.

11 (Dep. of Susan Reese ("Reese Dep.") at 142:20-23.)  Plaintiff

12 contends that Gilliam scheduled her to work weekends, knowing

13 that she taught dance on weekends to supplement her income.

14 (Reese Decl. ¶ 5.)  The new technician was going to take over

15 plaintiff's hours and work full time, and plaintiff's hours were

16 reduced to part-time, decreasing her income by 25%.  (UF ¶ 11;

17 Reese Decl. ¶ 5.)  Plaintiff objected to the decrease in hours

18 and changes to the schedule in writing.  (DF ¶ 99.)  Gilliam

19 informed plaintiff that she could have her schedule and hours

20 back once she no longer needed an accommodation for her injury.

21 (DF ¶ 38.)

22 　　　During her tenure at Barton, plaintiff received praise from

23 doctors, patients, and staff.  (DF ¶ 2.)  However, she also

24 received performance evaluations reflecting that she had room for

25 improvement regarding her attitude with employees from different

26

27 　　　[5]　Plaintiff asserts that there were no written complaints
   and that there is no evidence that plaintiff's work schedule
28 caused the complaints.  (UF ¶ 10.)

4

departments.  (See UF ¶ 13.)  Specifically, a performance
evaluation from April 2005 provided, in relevant part, that
plaintiff's "attitude with employees from other departments needs
a lot of work.  Susan was warned multiple times this last year
concerning her attitude."  (Ex. F. to Decl. of Leanne Kankel
("Kankel Decl."), filed Oct. 9, 2009, at 6.)  Her performance
evaluation from May 2006 provided:

> Susan is a very tenacious and schedule driven employee.
> . . . Tenacity, though an admirable trait, can be
> perceived by others as inflexible, having an attitude
> and as being unreasonable at times.  During this next
> year, I would like to see Susan work on having more
> patience and being a little more flexible with other
> departments in the hospital.  This will help eliminate
> the perception that she has a bad attitude.

(Ex. G to Kankel Decl. at 6.)

        In September 2007, plaintiff was issued a written warning
for an interaction with a patient.  (Ex. H to Kankel Decl.)  The
Disciplinary Action Notice provided that plaintiff made a face
and told a patient, who opened the exam room door when Reese was
eating lunch, that she would have to wait ten minutes; the
patient started to cry.  (Id.)  Kankel neither investigated the
matter nor asked plaintiff for her side of the story.  (DF ¶ 67.)
Plaintiff also disputed this action in writing.  (DF ¶ 69.)
Gilliam recommended that Reese participate in "Guest Services
Academy," a class offered by The Barton University.  (Ex. H. to
Kankel Decl.)  The September 2007 incident as well as plaintiff's
attendance in "Guest Services Academy" is documented in her
final, December 2007 performance evaluation.  (Ex. I to Kankel
Decl.)  The evaluation also noted that plaintiff had done a good
job going to her supervisors when she found herself upset or

"having feelings of intolerance towards co-workers throughout the hospital."  (Id.)

On Friday, January 25, 2008, after Gilliam informed plaintiff of the changes to her schedule, plaintiff was sick and had to go home immediately.  (Reese Dep. at 145-46; DF ¶ 60.) There were two patients scheduled for echo exams later that afternoon.  (Ex. J to Kankel Decl.)  Plaintiff did not reschedule the echo exams for the two patients.  (Ex. J to Kankel Decl.)

On January 28, 2008, Gilliam and Kankel met with plaintiff. (Reese Dep. at 146-47.)  Gilliam suspended plaintiff for three days for "patient abandonment" arising from plaintiff leaving without rescheduling the patient exams on the previous Friday. (Ex. J to Kankel Decl.)  Neither Gilliam nor Kankel sought plaintiff's side of the story.  (DF ¶ 52.)  Kankel did not investigate the matter.  (DF ¶ 53.)

At the same January 28, 2008 meeting, defendant contends that Kankel, Gilliam, and plaintiff engaged in the interactive process and discussed various methods for reasonably accommodating plaintiff's injury.  (See UF ¶ 18.)  Plaintiff contends that this meeting was not undertaken in good faith.  At the meeting, Kankel asked plaintiff, in regards to her limitation of five echo exams per day, "What happens if you do six?  Why can't you do more?"  (DF ¶ 92.)  In the Disciplinary Action Notice issued that day, Gilliam also stated that plaintiff had a "very strict interpretation of her work restrictions."  (Ex. J to Kankel Decl.)  Plaintiff attempted to complain to Vice President of Operations, Kathy Cocking ("Cocking"), but she was summarily dismissed and told by Cocking that she did not want to get in the

1  middle of the situation.  (DF ¶ 93.)  Plaintiff objected to the

2  suspension in writing.  (DF ¶ 102.)

3      Subsequently, on April 3, 2008, plaintiff was terminated.

4  (Ex. L to Kankel Decl.)  Cocking and Gilliam made the decision to

5  terminate plaintiff's employment.  (DF ¶ 83.)  Plaintiff was

6  given a Disciplinary Action Notice, providing that her

7  termination was effective immediately, and plaintiff was escorted

8  off the property by Cullen.  (DF ¶ 85.)  The Disciplinary Action

9  Notice provided that plaintiff was terminated for "[c]ontinued

10 behavior that is disrespectful to coworkers," failure to support

11 or train new trainees, and considering her own needs before the

12 patients' and department's needs.  (Ex. L to Kankel Decl.)  The

13 Disciplinary Action Notice also referenced previous warnings in

14 performance appraisals, verbal coaching and counseling, and the

15 written warning in September 2007.  (Id.)  Plaintiff contends

16 that she was never told to train the trainees, and plaintiff's

17 supervisor, Cullen, admitted that he tried not to schedule

18 plaintiff to work at the same time as the trainees.  (DF ¶¶ 72,

19 74.)

20     When plaintiff applied for a job with a prospective

21 employer, she communicated the reasons for termination set forth

22 in her Disciplinary Action Notice.  (DF ¶ 103.)  Specifically,

23 plaintiff checked the box indicating that she had "been fired,

24 asked to resign, or been subject to disciplinary action" and

25 provided that "employer states 'continued behavior that is

26 disrespectful to coworkers.'"  (Ex. 18 to Reese Decl.)  Plaintiff

27 did not receive the job.  (DF ¶ 113.)

28 /////

1    At some point during her employment at Barton, Joy Reese, a

2  Senior claim examiner who was administrating plaintiff's workers

3  compensation claim, was told by Yolanda Pearce, a Barton

4  employee, that plaintiff was a "pole dancer." (DF ¶ 104.)

5  Plaintiff trained in ballet since the age of five and teaches

6  ballet at the community college. (DF ¶¶ 106-07.) Plaintiff

7  found the statement highly offensive. (DF ¶ 106.) When she

8  approached Cocking about the comment, Cocking refused to speak to

9  her and told plaintiff to speak to her supervisor. (DF ¶ 108.)

10   On September 24, 2008, plaintiff filed her First Amended

11 Complaint, alleging claims for (1) discrimination in violation of

12 the Americans with Disabilities Act ("ADA"); (2) discrimination

13 on the basis of disability in violation of the Fair Employment

14 and Housing Act ("FEHA"); (3) failure to provide reasonable

15 accommodation on the basis of disability in violation of FEHA;

16 (4) failure to engage in the interactive process to identify and

17 provide a reasonable accommodation for a disability in violation

18 of FEHA; (5) retaliation on the basis of disability in violation

19 of FEHA; (6) wrongful termination in violation of public policy;

20 and (7) defamation per se. (FAC.) Plaintiff also seeks punitive

21 damages. (FAC, Prayer for Judgment ¶ 3.)

22                                **STANDARD**

23    The Federal Rules of Civil Procedure provide for summary

24 judgment where "the pleadings, the discovery and disclosure

25 materials on file, and any affidavits show that there is no

26 genuine issue as to any material fact and that the movant is

27 entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c);

28 see California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998).

1  The evidence must be viewed in the light most favorable to the
2  nonmoving party.  See Lopez v. Smith, 203 F.3d 1122, 1131 (9th
3  Cir. 2000) (en banc).

4      The moving party bears the initial burden of demonstrating
5  the absence of a genuine issue of fact.  See Celotex Corp. v.
6  Catrett, 477 U.S. 317, 325 (1986).  If the moving party fails to
7  meet this burden, "the nonmoving party has no obligation to
8  produce anything, even if the nonmoving party would have the
9  ultimate burden of persuasion at trial."  Nissan Fire & Marine
10  Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).
11  However, if the nonmoving party has the burden of proof at trial,
12  the moving party only needs to show "that there is an absence of
13  evidence to support the nonmoving party's case."  Celotex Corp.,
14  477 U.S. at 325.

15      Once the moving party has met its burden of proof, the
16  nonmoving party must produce evidence on which a reasonable trier
17  of fact could find in its favor viewing the record as a whole in
18  light of the evidentiary burden the law places on that party.
19  See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th
20  Cir. 1995).  The nonmoving party cannot simply rest on its
21  allegations without any significant probative evidence tending to
22  support the complaint.  See Nissan Fire & Marine, 210 F.3d at
23  1107.  Instead, through admissible evidence the nonmoving party
24  "must set forth specific facts showing that there is a genuine
25  issue for trial."  Fed. R. Civ. P. 56(e).
26  /////
27  /////
28  /////

**ANALYSIS**

**A.   Disability Discrimination under the ADA**

Defendant moves for summary judgment on plaintiff's ADA claim on the grounds that plaintiff cannot demonstrate that she is a qualified individual under the statute and, in the alternative, that she cannot demonstrate that she was discriminated against on the basis of her disability.

The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et.seq., prohibits an employer from discriminating "against a qualified individual with a disability because of the disability."  42 U.S.C. § 12112(a); <u>Kennedy v. Applause, Inc.</u>, 90 F.3d 1477, 1480 (9th Cir. 1996).  In analyzing a motion for summary judgment under the ADA, the court applies the burden shifting approach set forth by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under this approach, a plaintiff must first establish a prima facie case of discrimination, submitting evidence with respect to the following elements:  (1) that she was a disabled person within the meaning of the ADA; (2) that she was a "qualified individual"; (3) that the defendant terminated her, or otherwise unlawfully discriminated against her in regard to the terms, conditions and privileges of employment; (4) because of her disability.  Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 et seq.; <u>see Nunes v. Wal-Mart Stores, Inc.</u>, 164 F.3d 1243 (9th Cir. 1999).  The plaintiff may produce indirect evidence that gives rise to an inference of discriminatory motive.  <u>See</u> <u>Transworld Airlines, Inc. v. Thurston</u>, 469 U.S. 111, 121 (1985).

10

Once a plaintiff makes this initial showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  <u>See</u> <u>EEOC v. Hacienda Hotel</u>, 881 F.2d 1504, 1514 (9th Cir. 1989).  The ultimate burden of persuasion, however, remains with the plaintiff.  <u>Texas Dep't. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

If the employer articulates a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff must demonstrate that the reason is a pretext for discrimination.  The plaintiff may demonstrate pretext in one of two ways: "(1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer."  <u>Chuang v. Univ. of Cal. Davis, Board of Trustees</u>, 225 F.3d 1115, 1127 (9th Cir. 2000).  The factual inquiry regarding pretext requires a new level of specificity.  <u>Burdine</u>, 450 U.S. at 255.  Plaintiff must produce *specific* and *substantial* evidence that the defendant's reasons are really a pretext for discrimination.  <u>Aragon v. Republic Silver State Disposal, Inc.</u>, 292 F.3d 654, 661 (9th Cir. 2002).

**1.   Prima Facie Case**

Defendant asserts that plaintiff cannot establish a prima facie case of discrimination under the ADA because plaintiff is not substantially limited in a major life activity.  Defendant also contends that plaintiff cannot perform the essential

/////

functions of her job because she is incapable of performing more than five echo exams per day.

### a.   Disability within the Meaning of the ADA[6]

The ADA defines "disability," in relevant part, as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2).  The ADA defines major life activities to include both sleeping and lifting.  42 U.S.C. § 12102(2)(A) ("[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.").  It is also well-established in the Ninth Circuit that lifting and sleeping are major life activities for purposes of establishing a disability under the ADA.  Head v. Glacier N.W. Inc., 413 F.3d 1053, 1060 (9th Cir. 2005) (sleeping); McAlindin v. County of San Diego, 192 F.3d 1226, 1234 (9th Cir. 1999) (sleeping); Thompson v. Holy Family Hosp., 121 F.3d 537, 540-41 (9th Cir. 1997) (lifting).

"In general, 'substantially limited' refers to the inability to perform a major life activity as compared to the average

_____

[6]    The court notes that Congress amended the ADA in 2008 to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities and provide broad coverage."  Pub. L. No. 110-325, 122 Stat. 3553 (2008).  The amendments specifically rejected prior Supreme Court interpretation of the term "disability."  Id. However, because, as set forth infra, plaintiff has demonstrated genuine issues of material fact under the earlier interpretation of the statute, the court does not address the retroactivity of the 2008 amendments.  See Rohr v. Salt River Project Agric. Imp. & Power Dist., 555 F.3d 850, 853 (9th Cir. 2009); Dvorak v. Clean Water Servs., 319 Fed. Appx. 538, 540 n.1 (9th Cir. 2009).

person in the general population or a significant restriction 'as to the condition, manner, or duration' under which an individual can perform the particular activity." <u>Thompson</u>, 121 F.3d at 539. "Courts must consider the nature and severity of the plaintiff's impairment, the duration or expected duration of the impairment, as well as the permanent or long term impact of the impairment." <u>Rohr v. Salt River Project Agric. Imp. & Power Dist.</u>, 555 F.3d 850, 858 (9th Cir. 2009); 29 C.F.R. § 1630.2(j).

At the summary judgment stage, a plaintiff is not required to present comparative or medical evidence to demonstrate triable issue of material fact regarding the impairment of a major life activity. <u>Rohr</u>, 555 F.3d at 858-59 (quoting <u>Head</u>, 413 F.3d at 1058). Rather, a plaintiff's declaration may suffice if it is not "merely self-serving" and contains "sufficient detail to convey the existence of an impairment." <u>Id.</u> (quoting <u>Head</u>, 413 F.3d at 1059).

Plaintiff presents evidence that her injury prevents her from lifting her arm out laterally and applying pressure. Specifically, plaintiff presents evidence that she experiences pain when washing her hair, carrying groceries, washing windows, riding her bike, practicing yoga, kayaking, water skiing, and any other activity that requires her to lift her arm and apply pressure. (DF ¶ 10.) This injury also prevented her from repeatedly lifting her arm to her side and holding it in a stationary position while pressing against a patient, the position required for administering an echo exam. (DF ¶¶ 9, 28.) Under these facts, plaintiff has submitted sufficient evidence to raise a genuine issue of fact that she is substantially limited

13

in the major life activity of lifting.  <u>See</u> <u>Quinones v. Potter</u>, 661 F. Supp. 2d 1105, 1121-22 (D. Az. 2009) (holding that the plaintiff raised a genuine issue of material fact regarding a substantial limitation on the ability to lift where she had a five to twenty pound lifting restriction in addition to limitations in performing manual tasks); <u>cf.</u> <u>Thompson</u>, 121 F.3d at 540-41 (holding that a 25 pound restriction does not amount to a substantial limitation on the ability to lift).

Plaintiff also presents evidence that her injury prevents her from sleeping regularly.  Specifically, plaintiff asserts that approximately 4-6 days a week, she can only sleep about 2-4 hours.  (Reese Decl. ¶ 6.)  Plaintiff takes medications, but they do not allow her to obtain enough sleep to rectify the fatigue. (<u>Id.</u>)  Once she is awake, she has difficulty going back to sleep. (<u>Id.</u>)  She is routinely fatigued and exhausted, experiences headaches, has to rest during the day, and has to drink coffee in the morning and afternoon.  (<u>Id.</u>)  The lack of sleep makes her irritable, and she has difficulties going to the grocery store, cleaning the house, and running errands.  (<u>Id.</u> ¶¶ 6-7.)  This evidence is sufficient to raise a genuine issue of material fact regarding whether plaintiff is substantially limited in the major life activity of sleeping.  <u>See</u> <u>Head</u>, 413 F.3d at 10 (holding that evidence of the plaintiff's inability to sleep more than five or six hours a night, drowsiness during the day due to medications, and difficulty going to sleep was sufficient to demonstrate a substantial impairment in the major life activity of sleeping); <u>McAlindin</u>, 192 F.3d at 1235 (holding that evidence of the plaintiff's difficulty sleeping due to disruptions by his

numerous medications and his subsequent drowsiness at work was sufficient to demonstrate a substantial impairment in the major life activity of sleeping).

In its reply, defendant contends that plaintiff's declaration should not be considered because it contradicts her deposition testimony.  Defendant's contention is without merit.  Plaintiff testified in her deposition that she had trouble sleeping because she wakes up due to the pain in her arm, fingers, neck, and head.  She described the types of medication her doctor has prescribed to help her sleep.  (Reese Dep. at 97-100.)  Accordingly, the evidence relating to plaintiff's sleep disorder is neither contradictory nor "new information" as characterized by defendant.

As such, plaintiff has submitted sufficient evidence to raise genuine issues of material fact that she is substantially limited in the major life activities of lifting and sleeping.[7]

**b.    Essential Functions of the Job**

To state a claim for discrimination under the ADA, a plaintiff must establish that he or she is a "qualified individual."  42 U.S.C. § 12112(a).  "Qualification for a position is a two-step inquiry."  <u>Bates v. United Parcel Serv., Inc.</u>, 511 F.3d 974, 990 (9th Cir. 2007) (en banc).  First, the court must determine "whether the individual satisfies the 'requisite skill, experience, education and other job-related requirements' of the position."  <u>Id.</u> (quoting 29 C.F.R. §

---

[7]    Because the court concludes that plaintiff has raised a triable issue of fact that she was disabled, the court does not reach plaintiff's alternative argument that defendant regarded her as disabled.

15

1630.2(m)).   Second, the court must consider "whether the

individual 'can perform the essential functions of such position'

with or without a reasonable accommodation."   Id. (quoting 42

U.S.C. § 12111(8)).   Defendant does not challenge the first

inquiry.

In general, the "term essential functions means the

fundamental job duties of the employment position the individual

with the disability holds or desires."   29 C.F.R. § 1630.2(n).

It does not include the marginal functions of the positions.   Id.

A function may be essential if (1) the position exists to perform

that function; (2) there is a limited number of employees

available among whom the performance of that function can be

distributed; or (3) it requires specialized expertise or ability

to perform.   Id.   Further, "if an employer has prepared a written

description before advertising or interviewing applicants for the

job, this description shall be considered evidence of the

essential functions of the job."   42 U.S.C. § 12111(8).

However, the Ninth Circuit has cautioned that "[a] highly

fact-specific inquiry is necessary to determine what a particular

job's essential functions are."   Cripe v. City of San Jose, 261

F.3d 877, 888 n.12 (9th Cir. 2001).   An employer's assertions

regarding what it considers an essential function of the job

"does not qualify as an undisputed statement of fact in the

context of a motion for summary judgment."   Mustafa v. Clark

County Sch. Dist., 157 F.3d 1169, 1175 n.6 (9th Cir. 1998);

Lazcano v. Potter, 468 F. Supp. 2d 1161, 1167-68 (N.D. Cal.

2007).

/////

16

1   Defendant asserts that the essential functions of
2   plaintiff's position required her to be able to handle as many
3   echo exams as were scheduled throughout the day, including
4   emergencies; as such, her limitation to five echo exams per day
5   prevented her from performing that essential function.  However,
6   defendant fails to present evidence that any written description
7   of the job provided that an echo technician was required to
8   perform up to eight or ten echo exams a day.
9       Although consideration is given the employer's view of what
10  constitutes essential job functions, the court cannot conclude on
11  the evidence before it that handling more than five echo exams a
12  day was an essential function of the job.  Plaintiff presents
13  evidence that during the last few months that she worked for
14  Barton, the average number of echo exams a day was approximately
15  3.  (DF ¶ 30.)  An analysis of the number of echoes performed on
16  a daily basis in the five months after plaintiff was fired shows
17  that the echo department performed more than five echoes in a day
18  on only four days.  (DF ¶ 17.)  Further, over the course of three
19  years, there were only 27 instances where more than 5 echo exams
20  were performed in a day.  (DF ¶ 18.)  Plaintiff testified that
21  these rare instances could have been remedied by better
22  scheduling because, generally, when there were more than 5 echo
23  exams in a day, there would be only one echo exam scheduled for
24  the next day.  (DF ¶¶ 19, 21.)  As such, she could perform all
25  necessary echo exams with proper scheduling.  (DF ¶ 29.)
26  Moreover, it is undisputed that there were days when no echo
27  exams were scheduled, and plaintiff's supervisor admitted that
28  plaintiff often had only two or zero exams in a day.  (DF ¶¶ 22,

17

23.)  Plaintiff's supervisor also testified that he was unaware

of any emergency situation that occurred in 2007 or 2008.  (DF ¶

25.)  Finally, plaintiff's last performance evaluation, dated

December 31, 2007, provided that plaintiff performed the

technical portion of her position in a very professional manner,

kept up with changes in the field, and offered valuable input and

expertise in the introduction and assimilation of new software;

the performance evaluation does not mention any failure to

perform essential functions of her position due to the

limitations on the number of echo exams she could perform in a

day.  (Ex. I to Kankel Decl.)

Therefore, in light of the evidence submitted, plaintiff has

raised a genuine issue of material fact that she was able to

perform the essential functions of her job.

**2.   Legitimate, Non-Discriminatory Reason**

Defendant next contends that even if plaintiff can

demonstrate a prima facie case, her discrimination claim must

fail because Barton changed her working hours,[8] suspended her,

and terminated her for nondiscriminatory reasons.  Specifically,

defendant asserts that plaintiff's hours were changed due to an

overall plan implemented in response to complaints from doctors

and patients regarding the time it was taking to complete echo

---

[8]   Defendant contends that changing plaintiff's hours does
not qualify as an adverse employment action because it did not
"materially affect the terms, conditions, or privileges of
employment."  Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028,
1052 (2005).  However, it is undisputed that plaintiff's schedule
was not merely changed, but that her hours were significantly
reduced.  (DF ¶ 31.)  Further, plaintiff presents evidence that
she was scheduled to work at times when defendant knew she had
conflicts.

1  exams.  (UF ¶¶ 10, 11.)  Specifically, Barton contends that in

2  furtherance of this overall plan, it hired an additional echo

3  technician and began scheduling plaintiff to work weekends, which

4  had the overall effect of reducing her hours.  Defendant also

5  asserts that it suspended her on January 28, 2008 for abandoning

6  patients after plaintiff became upset and left work early due to

7  a conversation with a supervisor regarding changes to her work

8  schedule to accommodate her work restrictions.  (Ex. J Kankel

9  Decl.)  The supervisor asked her to reschedule the echo exams of

10  two patients scheduled for that day, but plaintiff refused.

11  (Id.)

12       Finally, defendant asserts that it terminated plaintiff

13  based upon insubordination and longstanding problems interacting

14  appropriately with management, co-workers, and patients.  (See UF

15  ¶ 14.)  The termination notice provided that in February and

16  March 2008, plaintiff was "non-supportive and unhelpful in the

17  orientation of 2 new trainees" and that the traveling technician

18  was required to perform all training.  (Ex. L to Kankel Decl.)

19  The notice also provided that plaintiff "considers her own needs

20  before the parties' and department's needs" as was demonstrated

21  by plaintiff's reluctance to train co-workers and the scheduling

22  of a disabled patient in March 2008.  Previous warnings were

23  referenced, including (1) a performance evaluation from April

24  2005 providing that plaintiff needed improvement in her attitude

25  towards other employees; (2) a performance evaluation from May

26  2006 providing that plaintiff should "work on having a little

27  more patience and being a little more flexible with other

28  departments" in order to "eliminate the perception that she has a

19

bad attitude"; (3) verbal coaching and counseling from May and July 2007; and (4) a written warning from September 2007 regarding plaintiff's reaction to a patient that opened the door during her lunch.  (Ex. L to Kankel Decl.; see Ex. F-H to Kankel Decl.)

Accordingly, defendant presents evidence to support its contention that plaintiff was terminated for legitimate, non-discriminatory reason.

### 3.   Pretext

However, plaintiff has presented sufficient evidence to demonstrate that defendant's proffered legitimate, non-discriminatory reasons for termination were pretext for unlawful discrimination in violation of the ADA.

First, with respect to defendant's contention that plaintiff was rescheduled in order to address complaints relating to delays in the completion of echo exams, plaintiff presents evidence that her accommodation was not the sole cause, if at all, of the delays.  Specifically, plaintiff submits a memo she received while working for Barton, setting forth issues relating to Sierra Nevada Cardiology Associates and Barton Health Care System.  (Ex. 15 to Reese Decl.)  The memo sets forth that (1) "[f]requently, physicians without [certain] privileges are included on the on-call list which causes turnaround issues with ECHO reads"; and (2) "[c]urrently, only the cardiologists are privileged to read ECHO exams."  (Id.)  There is no mention of scheduling problems with the echo technicians or plaintiff's limitation regarding the number of echo exams she could perform in a day.  It is also undisputed that there are only two doctors who have reading

privileges at Barton; if the doctors were unavailable, there was
a delay in reading the echos and communicating the results to the
doctors who ordered them. (DF ¶¶ 44-47.)  Delays also occurred
if patients forgot to fast before the exams. (DF ¶ 50.)
Moreover, plaintiff's supervisor told her that she could have her
old schedule and hours back once she no longer needed an
accommodation. (DF ¶ 28.)  As such, plaintiff has pointed to
specific and substantial evidence that from which a jury could
conclude that her schedule was changed and her hours reduced
because of her disability and not because of an overall plan to
improve response time.

Second, plaintiff presents evidence that her suspension for
abandoning patients was motivated by defendant's frustration with
her requested accommodation, not her conduct.  Specifically,
plaintiff presents evidence that on January 25, 2008, she left
work early because she had diarrhea and immediately had to go
home. (DF ¶ 60.)  Plaintiff was suspended without investigation
by Kankel, the Vice President of Human Resources, and without
inquiry into plaintiff's side of the story. (DF ¶¶ 53, 55.)[9]
Plaintiff's supervisor, Cullen, has admitted that plaintiff said
she was sick. (DF ¶ 62.)  Cullen also testified that if
plaintiff was sick, it would have been acceptable for her to go
home without rescheduling the remaining echo tests. (DF ¶ 63.)
Further, he also testified that it was not plaintiff's job to

---

[9]   Kankel testified that she did not ask for plaintiff's
side of the story because plaintiff "has a history." (DF ¶ 57.)
However, Kankel never met plaintiff until the
suspension/interactive process meeting in late January 2008. (DF
¶ 58.)

schedule echo exams; rather, the secretary scheduled exams.  (DF ¶ 65.)  Indeed, the two remaining exams for that day were rescheduled without any problems.  (DF ¶ 66.)  As such, plaintiff has raised a triable issue of fact regarding whether her suspension was motivated by discrimination based on her disability and not patient abandonment.

Third, plaintiff presents evidence that defendant's proffered reasons for termination are not wholly supported by her work history.  It is undisputed that during her tenure at Barton, plaintiff received praised from doctors, patients, and staff. (DF ¶ 2.)  Plaintiff's May 2006 performance evaluation commended Reese for her willingess to work on her days off to perform needed Echo exams for referring physicians.  The evaluation also provided that "[s]he works well with all of the Cardiologists in her department and has great rapport with her patients." (Ex. G to Kankel Decl.)  Further, in December 2007, plaintiff received another performance evaluation which, although noting the "opportunity for improvement" in the areas of respect and image, provided that she performed the technical aspects of her position in a very professional manner, attended all meetings within her area, completed the corrective action for her written warning regarding treatment of a patient in September 2007, and had "done a good job" of contacting supervisors when she was upset with a situation.  (Ex. I to Kankel Decl.)  Plaintiff also presents evidence that in her eleven years of employment with defendant, she received, at most, two patient complaints.  (DF ¶ 51.) Moreover, plaintiff was never instructed to train the temporary echo technician or the trainees.  (DF ¶¶ 70-73.)  Rather,

22

defendant admits that it tried not to schedule plaintiff at the same time as the echo trainees. (DF ¶ 74.) Under these facts, plaintiff has raised a triable issue of fact whether the listed reasons for termination were merely pretext for discrimination on the basis of disability.

Finally, plaintiff presents evidence that defendant was repeatedly hostile to her requested accommodations. Plaintiff asserts that her supervisor, Gilliam, became very angry the first time she refused to do a sixth exam in a day. (Reese Decl. ¶ 5.) She asserts that he would schedule more than six exams a day and make plaintiff tell staff to re-schedule patients. (Id.) In her disciplinary action notice relating to the suspension, Gilliam wrote that plaintiff has "a very strict interpretation of her work restrictions." (Ex. J to Kankel Decl.) Further, at the January 28, 2008 meeting, Kankel asked plaintiff, "What happens if you do six? Why can't you do more?" (DF ¶ 92.) When plaintiff attempted to complain to the Vice President of Operations, Kathy Cocking, she was summarily dismissed and told that Cocking didn't want to get in the middle of it. (DF ¶ 93.) Plaintiff testified that she felt pressured and shamed to perform more echo exams. (DF ¶ 91.)

Looking at all of plaintiff's evidence together, she has submitted sufficient specific and substantial evidence to raise a triable issue of fact that defendant's reasons for termination were pretext for discrimination on the basis of her disability. Therefore, defendant's motion for summary judgment regarding plaintiff's disability discrimination claim under the ADA is DENIED.

23

1        **4.    Punitive Damages**

2        Finally, defendant argues that even if plaintiff can raise

3   triable issues with respect to her claim for disability

4   discrimination in violation of the ADA, she cannot demonstrate

5   sufficient facts to support an award of punitive damages.   Under

6   the ADA, "[a] complaining party may recover punitive damages . .

7   . if [she] demonstrates that the respondent engaged in a

8   discriminatory practice or discriminatory practices with malice

9   or with reckless indifference to the federally protected rights

10  of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).   As set

11  forth above, plaintiff has presented evidence that her hours were

12  reduced, she was suspended, and she was ultimately terminated

13  because of her disability.   Plaintiff has also presented evidence

14  that defendant made hostile comments about her disability and

15  attempted to shame her into performing more echo exams than set

16  forth in her doctor's recommendation.   Accordingly, plaintiff has

17  presented sufficient evidence of malice or reckless indifference.

18  Therefore, defendant's motion to strike plaintiff's claim for

19  punitive damages is DENIED.

20  **B.    FEHA Claims**

21       **1.    Disability Discrimination**

22       Defendant moves for summary judgment on plaintiff's claim

23  for disability discrimination under FEHA for the same reasons set

24  forth in its argument for dismissal of plaintiff's ADA claim.

25  California courts apply the <u>McDonnell Douglass</u> burden shifting

26  approach to claims brought pursuant to FEHA and apply the same

27  guiding legal principles.   <u>See</u> <u>Brooks v. City of San Mateo</u>, 229

28  F.3d 917, 923 (9th Cir. 2000) (citing <u>Beyda v. City of Los</u>

24

Angeles, 65 Cal. App. 4th 511, 517 (1998); Okoli v. Lockheed

Tech. Operations Co., 36 Cal. App. 4th 1607, 1614 n.3 (Cal. Ct.

App. 1995)).   Therefore, for the reasons set forth above,

defendant's motion for summary judgment regarding plaintiff's

disability discrimination claim under FEHA is DENIED, and

defendant's motion to strike plaintiff's claim for punitive

damages is DENIED.

**2.   Failure to Provide Reasonable Accommodation and Failure to Engage in the Interactive Process**

Defendant moves for summary judgment on plaintiff's claims

for failure to provide reasonable accommodation and for failure

to engage in the interactive process in violation of FEHA on the

basis that it accommodated plaintiff's disability and that it

discussed plaintiff's situation with her "many times."  (Def.'s

Mot. for Summ. J. [Docket #25], filed Oct. 9, 2009, at 17.).[10]

California Government Code § 12940(n) makes it an unlawful

employment practice for an employer "to fail to engage in a

timely, good faith, interactive process with the employee . . .

to determine effective reasonable accommodations, if any, in

response to a request for reasonable accommodation by an

employee."  An employer's obligation to engage in an interactive

process is triggered when the employee gives the employer notice

of the disability and a desire for a reasonable accommodation.

Jensen v. Wells Fargo Bank, 85 Cal. App. 4th 245, 261 (2000).

_____

[10]    Defendant also argues that plaintiff is not a qualified individual because she cannot perform the essential functions of her position.  As set forth above in the court's discussion of plaintiff's ADA claim, plaintiff has raised a genuine issue of fact regarding this issue.

"'The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees' with the goal of 'identify[ing] an accommodation that allows the employee to perform the job effectively.'"  Id. (quoting Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1114 (9th Cir. 2000)); A.M. v. Albertsons, LLC, 178 Cal. App. 4th 455, 464 (1st Dist. 2009) ("The purpose of the interactive process is to determine what accommodation is required.").  For the process to work, "[b]oth sides must communicate directly, exchange essential information and neither side can delay or obstruct the process." Id. (internal quotation and citation omitted).  In analyzing a plaintiff's claim for failure to engage in the interactive process, the trial court must "isolate the cause of the breakdown . . . and then assign responsibility' so that liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown." Id. (internal quotations omitted).  "Employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1137-38 (9th Cir. 2001). "[A]n employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process." Barnett, 228 F.3d at 1116.

In order to prevail on a claim for failure to accommodate, a plaintiff bears the initial burden to show the existence of a reasonable accommodation. See Zukle v. Regents of Univ. of Cal.,

166 F.3d 1041, 1046 (9th Cir. 1999).  Under FEHA, a reasonable accommodation is a modification that will enable an employee to perform the functions of her job.  See Cal. Gov. Code § 12926(n)(1)-(2) (reasonable accommodations may include "[j]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.").

In this case, plaintiff presents sufficient evidence to raise a triable issue of fact that defendant failed to engage in the interactive process in good faith.  It is undisputed that defendant was aware of plaintiff's requested accommodation in May 2007.  However, there is no evidence of any discussion between plaintiff and her supervisors or a human resources representative regarding a reasonable accommodation until January 28, 2008, the same day plaintiff received notice that she was suspended.[11] (See UF ¶ 18.)  As such, the first interactive process occurred over seven months after plaintiff informed defendant of a need for an accommodation.  Kankel testified that she used the words "interactive process" to ensure "that there was no dispute about the fact that an interactive process had occurred."  (DF ¶ 97.) Further, the January 28 meeting occurred in conjunction with a

---

[11]    Defendant cites to plaintiff's deposition testimony in support of its assertion that it met "many times" with plaintiff. However, the cited deposition testimony does not support defendant's contention that plaintiff had a conversation with any of her supervisors regarding how to work in different positions. (Reese Dep. at 126:5-10.)

1  discussion with Gilliam regarding a disciplinary action, which,
2  as set forth above, plaintiff has raised a genuine issue was
3  pretext for disability discrimination.  Given plaintiff's
4  evidence regarding defendant's hostility to her requests to limit
5  the amount of echo exams she performed in a day, the lack of
6  discussions with plaintiff for over seven months after her
7  request for accommodation, and the scheduling of an interactive
8  process meeting immediately following a potentially pretextual
9  suspension, plaintiff has presented sufficient evidence for a
10 reasonable juror to conclude that defendant did not timely engage
11 in the interactive process in good faith.

12     Plaintiff also presents sufficient evidence to raise a
13 triable issue of fact that Barton failed to provide a reasonable
14 accommodation.  While defendant contends that it never forced
15 plaintiff to perform more than five echo exams, plaintiff
16 presents evidence that defendant harassed her about the
17 limitation and shamed her for not performing more.  As set forth
18 above, plaintiff also presents evidence that her hours were
19 reduced, she received disciplinary action, including suspension,
20 without termination, and was eventually terminated because of her
21 requested accommodation.  Accordingly, a reasonable juror could
22 conclude that defendant failed to provide plaintiff a reasonable
23 accommodation.

24     Therefore, defendant's motion for summary judgment regarding
25 plaintiff's claims for failure to engage in the interactive
26 process and failure to provide a reasonable accommodation is
27 DENIED.
28 /////

### 3.    Retaliation

Finally, defendant moves for summary judgment on plaintiff's claim for unlawful retaliation under FEHA for the same reasons set forth in its argument for dismissal of plaintiff's ADA discrimination claim.  Plaintiff presents evidence that she submitted written complaints to her supervisor, Gilliam, on January 26, 2008 and February 1, 2008, asserting that Barton was not accommodating her disability.  (DF ¶ 102.)  She was terminated two months later.  For the reasons set forth above as well as the short time period between plaintiff's written complaints and her termination, defendant's motion for summary judgment regarding plaintiff's retaliation claim under FEHA is DENIED.

### C.    Wrongful Termination in Violation of Public Policy

Defendant further moves for summary judgment on plaintiff's wrongful termination in violation of public policy claim on the basis that she has failed to raise a triable issue of fact with respect to any of her ADA or FEHA claims.

An employer's discharge of an employee in violation of a fundamental public policy embodied in a constitutional or statutory provision can give rise to a tort action.  Barton v. New United Motor Manufacturing, Inc., 43 Cal. App. 4th 1200, 1205 (1996).  In order to sustain a claim of wrongful termination in violation of public policy, plaintiff must prove that her dismissal violated a policy that is fundamental, beneficial for the public, and embodied in a statute or constitutional provision.  Turner v. Anheuser-Busch, Inc. 7 Cal.4th 1238, 1256 (1994) (citing Gantt v. Sentry Insurance, 1 Cal.4th 1083, 1095

1  (1992)).  Under California law, terminating an employee because

2  of her disability or in retaliation for complaining of

3  discriminatory conduct is sufficient to support a claim for

4  wrongful termination in violation of public policy.  <u>See</u> <u>City of</u>

5  <u>Moorpark v. Superior Court</u>, 18 Cal. 4th 1143, 1158-61 (1998).

6       Because, as set forth above, plaintiff has raised triable

7  issues of fact regarding her claims under the ADA and FEHA,

8  defendant's motion for summary judgment regarding her claim for

9  wrongful termination in violation of public policy is DENIED.

10 **D.   Defamation Per Se**

11      Finally, defendant moves for summary judgment on plaintiff's

12 defamation per se claim on the grounds that (1) the termination

13 notice was not defamatory; and (2) Barton's alleged comment that

14 plaintiff was a "pole dancer" is not actionable.

15      **1.   Disciplinary Action Notice**

16      Plaintiff's defamation per se claim is based, in part, on

17 statements made in her written "Disciplinary Action Notice,"

18 which provided that the problem leading to her termination was,

19 *inter alia*, "[c]ontinued behavior that is disrespectful to

20 coworkers."  (Ex. L to Kankel Decl.)  Plaintiff asserts that she

21 was forced to republish this statement to future employers.

22 Defendant contends that this statement is not actionable because

23 (1) the statement was true, (2) defendant did not publish the

24 statement; and (3) the statement was protected opinion in a

25 performance evaluation that did not accuse plaintiff of

26 reprehensible personal characteristics.

27 /////

28 /////

30

1       **a.   Falsity**

2     To state a claim for defamation, plaintiff must show the

3 intentional publication of a statement of fact that is false,

4 unprivileged, and has a natural tendency to injure or which

5 causes special damage.  <u>Smith v. Maldonado</u>, 72 Cal. App. 4th 637

6 (1999).  Defamation may be any publication which would "tend to

7 injure [the] person in his or her business or profession, or

8 otherwise cause actual damage."  <u>Rothman v. Jackson</u>, 49 Cal. App.

9 4th 1134, 1140 (1996).

10     In this case, plaintiff contends that she was terminated

11 because of her disability and request for accommodation and that

12 the reasons set forth in the "Disciplinary Action Notice" was a

13 false pretext for a discriminatory and retaliatory termination.

14 For the reasons set forth above, plaintiff has presented

15 sufficient evidence to raise a triable issue of fact that she was

16 terminated for unlawful reasons and not for "[c]ontinued behavior

17 that is disrespectful to coworkers" or the other reasons set

18 forth in the termination notice.  (Ex. L to Kankel Decl.)

19 Accordingly, plaintiff has presented sufficient evidence to raise

20 a genuine issue of fact that the statements set forth in the

21 Disciplinary Action Notice were false.

22       **b.   Publication**

23     "Publication, which may be written or oral, is defined as a

24 communication to some third person who understands both the

25 defamatory meaning of the statement and its application to the

26 person to whom reference is made."  <u>Ringler Assocs. Inc. v.</u>

27 <u>Maryland Cas. Co.</u>, 80 Cal. App. 4th 1165, 1179 (2000).

28 Publication to a single individual is sufficient to set forth a

1   claim for defamation.  _Id._  Generally, when a plaintiff

2   voluntarily discloses the contents of a libelous communication to

3   others, the originator of the defamatory statement is not liable

4   for the consequent damage.  _McKinney v. County of Santa Clara_,

5   110 Cal. App. 3d 787, 796 (1980).  A defendant may be liable for

6   the foreseeable republication of a defamatory statement by a

7   plaintiff if

8          [1] the person defamed [is] operating under a strong
           compulsion to republish the defamatory statement; and
9          [2] the circumstances which create the strong
           compulsion are known to the originator of the
10         defamatory statement at the time he communicates it to
           the person defamed.

11

12  _Id._ at 797-98.  "This exception has been limited to a narrow

13  class of cases, usually where a plaintiff is compelled to

14  republish the statements in aid of disproving them."  _Live Oak_

15  _Publ'g Co. v. Cohagan_, 234 Cal. App. 3d 1277, 1285 (1991).

16      In the employment context, a plaintiff may have a strong

17  compulsion to republish wrongful grounds for termination to

18  prospective employers in order to explain away negative

19  inferences that will be learned through investigation of the

20  plaintiff's prior employment.  _See id._; _McKinney_, 110 Cal. App.

21  3d at 797-98.  However, in order for a plaintiff to operate under

22  "strong compulsion" under these circumstances, he must

23  demonstrate that there was a "negative job reference"

24  attributable to defendant that he had to explain.  _Davis v._

25  _Consol. Freightways_, 29 Cal. App. 4th 354, 373 (1994).

26      In this case, the "Disciplinary Action Notice" provided that

27  plaintiff was terminated due to disrespectful behavior with

28  coworkers and because she put her own needs before those of the

                                    32

1   patients and the department.  These remarks are sufficient to

2   raise a triable issue that there was a negative job reference

3   attributable to defendant, and thus, plaintiff had a strong

4   compulsion to explain away the reference.  (DF ¶ 103.)  Further,

5   defendant fails to present any evidence that it had a policy

6   against giving out this type of information to prospective

7   employers about former employees.  <u>Cf.</u> <u>Davis</u>, 29 Cal. App. 4th at

8   373 (holding that the plaintiff failed to establish publication

9   where defendant had a strictly enforced policy against giving out

10  any information to prospective employers about former employees

11  except their dates of employment and the plaintiff failed to

12  produce any evidence that the defendant had spoken about the

13  incident to anyone outside of management).[12]  Accordingly,

14  plaintiff has raised a genuine issue of fact regarding

15  publication of the alleged defamatory statement.

16              **c.   Protected Opinion**

17       A statement of opinion "cannot be false and is outside the

18  meaning of libel." <u>Tschirky v. Superior Court</u>, 124 Cal. App. 3d

19  534, 539 (1981).  In determining whether a statement is fact or

20  opinion, "[t]he court examines the communication in light of the

21  *context* in which it was published." <u>Jensen v. Hewlitt-Packard</u>

22  <u>Co.</u>, 14 Cal. App. 4th 958, 970 (1995).  "The court must look at

23  the nature and full content of the communication and to the

24  knowledge and understanding of the audience to whom the

25  publication was directed." <u>Campanelli v. Regents</u>, 44 Cal. App.

26  4th 572, 578 (1996) ("Even if they are objectively unjustified or

27  _____

28       [12]   Even if defendant has such a policy, there are no facts
    in the record to suggest that plaintiff was aware of it.  <u>See</u> <u>id.</u>

made in bad faith, publications which are statements of *opinion* rather than fact cannot form the basis for a libel action.") (emphasis in original).  Ultimately, "[t]he dispositive question is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion." Id. (internal quotations omitted).

In this case, plaintiff's Disciplinary Action Notice provided that she was terminated due to her interpersonal skills, treatment of trainees, and lack of consideration of the needs of patients and of the department.  (Ex. L to Kankel Decl.)  As set forth above, plaintiff presents evidence that these were not the reasons for termination; rather, her disability and requests for accommodation were the true reasons for discrimination. Accordingly, a reasonable fact finder could conclude that defendant's proffered reasons for termination were false.

Defendant's reliance on the court's opinion in Jensen is misplaced.  Jensen, 14 Cal. App. 4th at 965.  In Jensen, the court held that comments made on a performance evaluation are non-actionable statements of opinion, "unless an employer's performance evaluation falsely accuses an employee of criminal conduct, lack of integrity, dishonesty, incompetence or reprehensible personal characteristics."  Id.  The court reasoned that "the word 'evaluation' denotes opinion, not fact" and that the purpose of the document was "as a management tool for examining, appraising, judging, and documenting the employee's performance."  Id. at 970.  The facts of Jensen are readily distinguishable from the facts in this case.  Here, the alleged defamatory statement is set forth in a Disciplinary Action

Notice, not a performance evaluation.  Given that the document
terminated plaintiff effective immediately, its purpose was not
as a management tool for evaluation and documentation of
plaintiff's performance.  Rather, it served as the factual basis
for plaintiff's termination.  As such, the court cannot conclude
that the statements in the Disciplinary Action Notice were non-
actionable statements of opinion.

Accordingly, defendant's motion for summary judgment
regarding plaintiff's defamation per se claim arising out of the
Disciplinary Action Notice is DENIED.

**2.   Pole Dancer**

Plaintiff's defamation per se claim is also based on a
statement allegedly made by Yolanda Pearce, a Barton employee, to
Joy Reese, a Senior claim examiner who was administrating
plaintiff's workers compensation claim, that plaintiff was a
"pole dancer."  Defendant contends that this statement is not
actionable because (1) there is no evidence that the statement
was made by a manager or supervisor in the course and scope of
plaintiff's employment; and (2) the statement is privileged.

"Under principles of respondeat superior, an employer may be
held liable for a defamatory statement made by its employee."
Kelly v. General Telephone Co. 136 Cal. App. 3d 278, 284 (1982)
(citing Sanborn v. Chronicle Pub. Co., 18 Cal.3d 406, 411
(1976)); see Rivera v. National R.R. Passenger Corp., 331 F.3d
1074, 1080 (9th Cir. 2003) (noting that a corporation "may be
held liable for defamatory statements made by its employees under
the doctrine of respondeat superior.").  "Respondeat superior
liability is triggered if the defamation occurred within the

scope of the employee's employment," even if the principal is not aware of the statement and the statement was not made for the benefit of the principal.  <u>Rivera</u>, 331 F.3d at 1080.  Statements are made within the scope of employment if such statements are those "that may fairly be regarded as typical of or broadly incidental to the enterprise undertaken by the employer."  <u>Id.</u> (holding that corporation could be liabile for statements made by the plaintiff's supervisors and co-workers about the plaintiff's falsification of a timecard and alleged threats made to "blow people away"); <u>see</u> <u>McLachlan v. Bell</u>, 261 F.3d 908, 912 (9th Cir. 2001) (holding that employees' defamatory statements made at work about matters relating to work were within the scope of their employment for purposes of *respondeat superior* and recognizing that California's *respondeat superior* doctrine imposes a broad rule of liability on employers); <u>Mary M. v. City of Los Angeles</u>, 54 Cal. 3d 202 (1991) (finding that an action is within the scope of employment "when in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.") (citations and internal quotation marks omitted).

     In this case, plaintiff presents evidence that the statement describing plaintiff as a pole dancer was made by Yolanda Pearce, a Barton employee,[13] in her discussions with Joy Reese, who was

_____

     [13]    Defendant's reliance on <u>Kelly</u>, 136 Cal. App. 3d 278, 284 (1982), for the proposition that a corporation can only be held liable for defamation if the statement at issue is made by a manager or supervisor is misplaced.  <u>Kelly</u> does set forth that
(continued...)

defendant's third party administrator for workers compensation claims.  (Dep. of Joy Reese ("Joy Reese Dep.") at 26:22-25) Yolanda Pearce was Joy Reese's contact person at Barton, and the statement was made during a discussion of plaintiff's workers' compensation claim.  (<u>Id.</u> at 26-27.)  As such, under the evidence submitted by plaintiff, the statement was made within the scope of Yolanda Pearce's employment with Barton.  Accordingly, plaintiff has raised a genuine issue of material fact with respect to her defamation per se claim based on the statement that she was a "pole dancer."

Defendant conclusorily asserts that any comment made by Yolanda Pearce to Joy Reese is privileged under California Civil Code § 47(c) because the communication served a common interest within the company.  Defendant bears the burden of proof to show that a statement is privileged.  <u>See</u> <u>Lundquist v. Reusser</u>, 7 Cal. 4th 1193, 1202 (1994).  However, defendant has failed to proffer any argument, let alone evidence, identifying the common interest or explaining how the communication was reasonably calculated to further that interest.  <u>Cf.</u> <u>Kelly</u>, 136 Cal. App. 3d at 285 (holding that supervisor's statement to the corporation's managing agent that the plaintiff had misused company funds and falsified invoices was privileged because it served the company's common interest in insuring honest and accurate records and there

---

[13](...continued)
rule nor support that proposition.  While the facts in <u>Kelly</u> involved a corporation's liability for the statements of its supervisor, the holding was not dependent upon the employee's status as a supervisor.  Moreover, the court can find no authority to support defendant's proposed rule of *respondeat superior* liability for defamation.

1  was no allegation of malice).  Indeed, Joy Reese did not work for
2  Barton, but rather for a third party claims administrator.  (Joy
3  Reese Dep. at 26.)  As such, defendant has failed to demonstrate
4  that the § 47(c) privilege applies as a matter of law.

5      Therefore, defendant's motion for summary judgment regarding
6  plaintiff's defamation per se claim arising out of the "pole
7  dancer" statement is DENIED.[14]

**CONCLUSION**

9      For the foregoing reasons, defendant's motion for summary
10 judgment is DENIED.

11     IT IS SO ORDERED.

12 DATED: March 2, 2010

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

---

26     [14]    Defendant also argues that being called a "pole dancer"
   is not actionable as defamation per se.  For the reasons set
27 forth in the court's Memorandum & Order addressing defendant's
   motion to dismiss, the court finds this argument unpersuasive.
28 (See Mem. & Order [Docket #19], filed Dec. 15, 2008.)